# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BONNIE M. BURNS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-12-cv-3435 |
| CAROLYN W. COLVIN, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION[1] | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Bonnie Burns ("Burns") seeks judicial review of a final determination by Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), that she is not entitled to disability benefits under the Social Security Act (the "Act"). The case has been transferred to this Court pursuant to 28 U.S.C. § 636(b)(1) and the Cost and Delay Reduction Plan under the Civil Justice Reform Act.[2] Before the Court is Burns' Motion for Summary Judgment, the Commissioner's Motion for Summary Judgment, and Burns' Reply to the Commissioner's Motion for Summary Judgment. (Dkt. 6-8.) Having considered the briefing, the applicable legal authorities, and all matters of record, the

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Burns filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. *See* FED. R. CIV. P. 25(d).

[2] Dkt. 3.

Court **recommends** that Burns' motion be **denied** and that summary judgment be **granted** for the Commissioner.

## I.     BACKGROUND

Burns is a 48-year-old woman with a trade school education.  Her past relevant work is as an administrative clerk.  Burns has a history of manic depression, depression, upper body injuries, and stomach problems.  Burns alleges that she became disabled on May 1, 2008.

### A. *Burns' Upper Body Injury, Workers Compensation Claim, and First Application for Social Security Benefits*

On April 29, 2008, Burns was injured while working at Ben Taub Hospital.  On that day, Burns was struck by closing elevator doors on two separate occasions— once in the morning and again in the afternoon.  After the second occurrence, Burns sought treatment in the hospital's ER.  The ER doctor observed no visible trauma or bruises to Burns' shoulders, chest, or upper back, and further noted that Burns could move both shoulders without difficulty.  (Tr. 385).  Burns was diagnosed with muscle pain and prescribed ibuprofen.  (Tr. 385).  Burns applied for workers compensation benefits as a result of her injuries.

On May 14, 2008, Burns saw Dr. Karen Thompson, a chiropractor.  Burns described her residual pain from the elevator incidents as "not changing," and told Dr. Thompson that her overall health was "poor."  (Tr. 393).  Dr. Thompson's physical exam revealed significant limitations in Burns' cervical and dorso-lumbar motion.  (Tr. 397).

On July 2, 2008, Burns went to ErgoRehab, a comprehensive occupational rehabilitation center, for a Functional Capacity Assessment. Burns reported that she was "dependent" on opioid pain medication, but that the medication did not improve her symptoms. (Tr. 542). The evaluating physical therapist, Steven Sopher, noted multiple inconsistencies between Burns' claimed pain level of "9 out of 10" and the results seen during her assessment. (Tr. 545). Although Burns appeared to struggle during the assessment while lifting a 2½ pound weight, Sopher noted that Burns could lift and carry her four-pound purse with one hand. (Tr. 545). Sopher further noted that Burns' reported activities were inconsistent with a reported "9 out of 10" pain level. (Tr. 545).

On July 17, 2008, Burns underwent a MRI examination of her left shoulder. (Tr. 398). The MRI revealed slight tendinitis of the supraspinatus tendon and minimal arthropathy of the acromioclavicular joint, but no other significant abnormalities. (Tr. 398).

On August 29, 2008, Burns was assessed by Dr. Joseph Rosiles, a physician with Churchill Evaluation Centers. Dr. Rosiles assigned Burns a 0% Whole Person Impairment and opined that Burns had achieved maximum medical improvement. (Tr. 530-532).

On February 27, 2009, Dr. Brian C. Buck reviewed Burns' medical records and concluded that she had a "complete lack of response" despite more than a dozen chiropractic sessions. (Tr. 527). Dr. Buck opined that Burns' physical complaints had "absolutely no objective basis whatsoever" and were "not a function of the compensable

injury." (Tr. 527). Finally, Dr. Buck noted, "there is no pathology identified in the cervical, thoracic, or lumbar spines to warrant any impairment rating." (Tr. 527-528).

Shortly thereafter, on April 3, 2009, Burns filed her first application for Social Security disability insurance benefits, alleging that she had been disabled since May 1, 2008. (Tr. 272). Burns' application did not list any specific symptoms, and the field office interviewer did not note any immediately noticeable abnormalities other than Burns walking "a little bent forward." (Tr. 273-274). In the first Function Report included as part of her disability application, Burns stated that she was able to cook, perform light household chores, attend church, and shop for groceries. She also stated that she left her home for various purposes four times a week. (Tr. 265-268). Burns claimed she had difficulty squatting, bending over, kneeling, climbing stairs, lifting items weighing more than three pounds, and walking more than a block. (Tr. 269). Burns also claimed she suffered from depression as well as the feeling of "being watched and stalked by a stranger." (Tr. 269-270).

After filing her application for Social Security benefits, Burns continued to apply for workers' compensation benefits. As part of that process, Burns visited Dr. Gilbert Mayorga, a Harris County Hospital physician, on April 24, 2009. Dr. Mayorga noted that Burns had previously been assigned a 0% impairment rating and that he had not yet seen Burns' previous MRI and test results. Nonetheless, based on her reported pain, Dr. Mayorga diagnosed Burns with a cervical spine sprain, a lumbar sacral sprain, and various contusions. (Tr. 524-525). He also signed her workers' compensation status

report, affirming that Burns could not return to work due to "ongoing severe functional deficit." (Tr. 523).

On June 5, 2009, Burns underwent a psychological consultation examination with Dr. Kathleen Senior, a psychologist. Burns' level of effort during the exam was described as "marginal." (Tr. 416). Although Burns was "oriented in all spheres" and her remote memory deemed "intact," her recent memory was found to be poor. (Tr. 417). Burns reported a belief that "people are following and watching me," but denied experiencing hallucinations. (Tr. 416). Burns also reported recent suicidal ideations and a history of suicide attempts dating back to 1997. She also stated that she was experiencing sleep disturbances, an increased appetite, irritability, a higher frequency of crying, and general reduced motivation and interest. (Tr. 416).

Burns' first application for Social Security disability benefits was initially denied on July 24, 2009.

### B. Breast Cancer

On June 30, 2009, shortly before her first application for Social Security benefits was initially denied, Burns visited an emergency room complaining of a painful mass adjacent to her right breast. (Tr. 627-634). A biopsy confirmed the mass was cancerous. (Tr. 293). On October 8, 2009, Burns underwent a bilateral mastectomy. (Tr. 495). On November 3, 2009, Burns had an additional surgery to insert a port-catheter for chemotherapy. (Tr. 657-659). She then underwent frequent rounds of chemotherapy through May 2010.

After her cancer diagnosis, but prior to her mastectomy, Burns appealed the initial denial of her application for Social Security benefits. (Tr. 286-294). She subsequently filed a Work History and Function Report on October 7, 2009, one day prior to her mastectomy surgery. (Tr. 295-305). Burns reported that she stopped working at Ben Taub Hospital in November 2008 and that she had not been employed since that time. (Tr. 295). Burns also stated that her physical and mental condition had deteriorated substantially, and that she now required assistance with virtually every aspect of her day-to-day life. (Tr. 298-303). Burns stated that she experienced pain while performing even mundane tasks such as bathing and getting dressed. Burns also claimed that she left her house only one time per week and only if someone else could drive her to her destination. (Tr. 301). Finally, Burns claims to be unable to perform any of the physical tasks listed in Section C of the form due to ongoing pain and depression. She also repeated earlier claimd that she was being stalked by strangers. (Tr. 303-304).

### C. July 2010—First ALJ Hearing and Decision

On July 7, 2010, Administrative Law Judge ("ALJ") Gary J. Suttles conducted a hearing on Burns' application for benefits, where she was represented by counsel. Burns testified that, according to her oncologist, her cancer was in remission and that she was no longer undergoing chemotherapy or taking any prescribed drugs for that condition. (Tr. 77-78). She also stated that she had been diagnosed with major depressive disorder in 1995, and that she took her medication sporadically. (Tr. 78-80).

On July 29, 2010, ALJ Suttles issued a decision finding that Burns was not disabled. After reviewing the medical evidence, he concluded that, although Burns

suffered from the "severe" impairments of neck and shoulder bilateral impairments and bipolar disorder, her impairments did not meet or medically a listing-level impairment. ALJ Suttles concluded that Burns had the residual functional capacity ("RFC") to perform light work over a normal eight-hour workday. (Tr. 114). In reaching this conclusion, the ALJ noted that Burns had received intermittent mental health treatment in the past, but that she had only begun receiving recent treatment on the day prior to the hearing. (Tr. 115). The ALJ also noted that, although Burns claimed she was disabled between February 2009 and May 2010, she had received unemployment benefits during that time and affirmed that she was "willing and able to work." ALJ Suttles stated that he found Burns' receipt of unemployment benefits, "while not determinative," nevertheless indicated "a lack of motivation to return to work based on non-medical factors." (Tr. 115).

Burns appealed the ALJ's decision to the Appeals Council on September 14, 2010. (Tr. 172).

### D. Burns' Second Application for Social Security Benefits and Continued Medical Treatment

On November 15, 2010, while her appeal of the ALJ's July 2010 decision was pending, Burns filed a second application for Social Security benefits. (Tr. 247).

On January 21, 2011, her oncologist concluded that Burns was "doing well," and recommended removal of her port-catheter. (Tr. 1080). On February 2, 2011, Burns saw Dr. Dave Cole for a psychological report and clinical interview. (Tr. 829). During the interview, Dr. Cole noted that Burns was "easily irritated and angered." Much of Dr.

Cole's report details Burns' self-described feelings and experiences, including complaints of auditory hallucinations and paranoid delusions that "people … are watching [her]." (Tr. 830). Based upon this interview, Dr. Cole opined that it would be difficult for Burns to handle the rigors of both an eight-hour workday and a 40-hour workweek. (Tr. 178). Dr. Cole assigned Burns a Global Assessment Functional ("GAF") score of 50, opining that she had "moderate to severe impairment" in areas such as work and family relations. (Tr. 832).

On March 8, 2011, Burns visited Dr. Britta Ostermeyer, an attending psychiatrist at Ben Taub Hospital. During this visit, Burns stated that she was only taking her prescribed antidepressant medication "when upset," or "about [three] times a week." (Tr. 868). Dr. Ostermeyer "[e]ducated her about how to take an antidepressant," and reminded Burns that the medications needed to be taken on a daily basis. (Tr. 868). In a follow-up visit on March 30, 2011, Burns stated that she had improved substantially, was "feeling well in general," was "trying to enjoy her life," and no longer had suicidal ideations. (Tr. 1096). Burns also reported that she was taking her prescribed medications regularly, including two antidepressant drugs. (Tr. 1096, 1098).

Burns returned to Ben Taub on two occasions in May 2011. During her first visit, on May 20, 2011, Burns reported back pain while doing housework and that she was worried this was a sign that her cancer had returned. (Tr. 880). She was examined by an oncologist, Dr. Daniel Epner, who concluded that she "appears healthy [but] slightly anxious." (Tr. 880). Burns was prescribed stretching and strengthening exercises to relieve her back pain. (Tr. 880). Four days later, Burns stated that she was continuing to

experience problems with depression, although not as severely as in the past, as well as fatigue. (Tr. 863). Dr. Ostermeyer noted that Burns denied having paranoid ideations or hallucinations, and described her as "alert" with cognition "intact." (Tr. 863). Burns returned to Ben Taub for MRI scans in June and October 2011. Both tests indicated mild disc degeneration in her back. Burns' port-catheter was removed on October 17, 2011 without complication. (Tr. 1184-90).

### E. Consolidation of Social Security Applications/Second ALJ Hearing

On March 21, 2011, Burns received notice that the Social Security Administration had initially granted her November 15, 2010 application for disability benefits. (Tr. 125). Further, on August 4, 2011, Burns received notice that the Appeals Council had granted her request for review of ALJ Suttles' July 29, 2010 decision. (Tr. 176). The Appeals Council consolidated her appeal of the 2010 decision with the initial grant of her second application for benefits, and forwarded both claims to ALJ Suttles for further proceedings. (Tr. 176).

On January 13, 2012, Burns had her second ALJ hearing. At the beginning of the hearing, ALJ Suttles noted that the Appeals Council had remanded Burns' first application on the grounds that no medical expert was present at her first hearing. (Tr. 42). He also stated that the Council's requested consultative exam of Burns had not yet taken place, but that it could be handled post-hearing. (Tr. 42). Burns was again represented by counsel at the hearing.

In her second hearing, Burns initially testified that she had received unemployment benefits for "about nine months" after working at Ben Taub Hospital.

(Tr. 47). After the ALJ pointed out evidence showing she had in fact received unemployment benefits for over 18 months, Burns stated she did not remember how long she had received benefits. (Tr. 47). The ALJ then asked whether Burns' unemployment filings had affirmed that she was willing and able to work, and she conceded that they had. (Tr. 48).

Burns next described her physical and mental symptoms, stating that she remained in lingering pain from the elevator accident four years earlier. She testified that prescription pain medication helped "a little bit," but her pain level remained at 8 out of 10 even with her medication. (Tr. 50). She stated she had stopped physical therapy because "it just makes [the pain] worse." (Tr. 51). Burns testified that she "still ha[d] the cancer," and that "they didn't get all the cancer." (Tr. 51). However, Burns admitted that no doctor had diagnosed a reoccurrence of her cancer. (Tr. 51). Burns described her recent psychiatric treatment for her major depressive disorder. She stated that she saw a therapist once a month and was "continuously" taking two prescribed medications to treat it. (Tr. 54). She also testified that she "never feel[s] like going out of the house" and that she could not "mentally or physically" handle returning to work. (Tr. 56).

Burns' attorney subsequently asked her to describe any lingering side effects from her elevator accident as well as her chemotherapy treatments. Burns replied that she still felt "weakness and fatigue" along with "numbness and tingling" in her extremities "once or twice a week." (Tr. 57-58). She also stated that her general symptoms of pain and paranoia had worsened since her previous hearing, even though she had been regularly taking her medication. (Tr. 59).

An impartial medical expert ("ME"), Dr. Nancy Turrand, testified that she believed Burns might meet a psychiatric Listing for depression, but it was her opinion that Burns met portion A of the Listing but not portions B or C. (Tr. 60-62). However, Dr. Turrand pointed out that Burns' psychiatric record was incomplete because of a lack of regular treatment.

Byron Pettingill, a Certified Rehabilitation Counselor and impartial vocational expert ("VE"), testified that he believed Burns would be unable to perform her past work as a hospital admissions clerk, which was sedentary, semi-skilled work. (Tr. 63-64). The ALJ asked Pettingill to assume a hypothetical person with Burns' age and education, who could: (1) stand and walk for about four hours in an eight-hour day, or sit for six; (2) lift or carry 10 pounds frequently, and 20 pounds occasionally; (3) occasionally climb stairs, lift items bilaterally, push with the lower extremities, and occasionally bend, stoop, crouch, crawl, balance, twist, and squat; (4) have limited exposure to heights, dangerous machinery, or uneven surfaces; (5) never climb ladders, ropes, or scaffolds, or engage in running; and (6) understand simple instructions, concentrate and perform simple tasks, adapt to workplace changes in supervision, and get along with others in a limited public employee contact setting. (Tr. 64). Pettingill testified that a person with such limitations would not be able to perform Burns' past work. However, such a person could perform unskilled work at the light or sedentary level, including work as a laundry folder, or "very simple-type office work" such as a clerk or in a retail facility. (Tr. 65). Pettingill also testified that Burns could experience difficulty finding competitive employment if she missed three workdays a month due to her various medical issues. (Tr. 65).

### F.  Post-Hearing Examination

On February 6, 2012, Burns returned for a second examination at Genesis Assessment Services with Dr. Dave Cole.  (Tr. 1222).  Dr. Cole again concluded that Burns was suffering from Major Depressive Disorder, but this time diagnosed her as having antisocial personality disorder as well.  Dr. Cole assessed Burns as having a GAF score of 60, with mild to moderate impairment in areas such as work, school, and family relations.  (Tr. 1226).  Burns' counsel subsequently requested a supplementary hearing to discuss these new findings.  (Tr. 363).

### G.  Third ALJ Hearing

On April 4, 2012, ALJ Suttles held a supplementary hearing.  Dr. Nancy Terrand, testified that, after reviewing Dr. Coles' most recent opinion, her own medical opinion had not changed.  She testified that Burns suffers from some mild impairments in the A and B portions of the psychiatric listing criteria, but that no C criteria were satisfied.  (Tr. 33).  Dr. Terrand further indicated that there were "some inconsistencies and some symptom magnification" in Burns' medical records.  (Tr. 33).  Burns testified, again stating that she "cannot do any type of labor work."  (Tr. 38).

### H.  The ALJ's May 11, 2012 Decision

On May 11, 2012, ALJ Suttles issued his third decision finding that Burns was not disabled.  He reviewed all of the medical evidence and testimony and found that, although Burns suffered from the "severe" impairments of bipolar/affective/personality disorder and musculoskeletal complaints, she did not have a listing-level impairment.

When addressing her mental impairments, the ALJ noted that "[t]he severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04." (Tr. 16). He found that Burns did not meet the "paragraph B" criteria, noting that she never experienced any episodes of decompensation, lives independently in her home, and performs a full range of household chores. (Tr. 16). The ALJ noted that Burns showed marked signs of improvement in March 2011, when she was consistently taking her antidepressant medication. While the ALJ found that Burns had moderate difficulties with social functioning, he also noted that she was able to communicate with her family and others. (Tr. 16). Further, the ALJ found that none of the medical evidence supported a finding that Burns suffered from any "paragraph C" criteria.

With respect to her breast cancer, the ALJ noted that, although Burns' breast cancer had been discovered during her alleged disability period, her subsequent recovery period following her mastectomy lasted less than 12 months. (Tr. 12). Therefore, the ALJ determined that Burns' cancer remained in remission and was thus not a severe impairment. (Tr. 12).

The ALJ noted that the results of both of Burns' RFC assessments – from July 2, 2008, and June 24, 2010—were largely similar, and found that Burns could engage in sedentary, light-level forms of work. (Tr. 13-14). The ALJ also found that Burns could perform simple tasks and easily understand simple instructions. (Tr. 15). Although he found that Burns "demonstrates delusion of paranoia," he noted that she was nonetheless described as "alert and oriented in all spheres." (Tr. 14).

The ALJ stated that he discounted Dr. Dave Cole's assessments of Burns' mental impairments, finding that Dr. Cole's reports "[did] not coincide with his functional capacity assessment." (Tr. 14). In contrast, the ALJ gave more weight to the opinions of Dr. Nancy Terrand, concluding that her testimony "best summarize[s] the record before the undersigned." (Tr. 16). The ALJ found Dr. Terrand's opinions to be "credible and consistent with the objective evidence of record," and he consequently gave them "*great weight* in the determination of disability for Social Security purposes." (Tr. 16) (emphasis in original).

Setting out Burns' RFC, ALJ Suttles stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functioning capacity to perform light work as defined in 20 C.F.R. 404.1567(b), occasionally lifting 20 pounds and frequently 10 pounds. Her push/pull and gross/fine dexterity is unlimited except for occasional overhead lifting and occasional pushing with the lower extremities, bilaterally. She can occasionally climb stairs but no ladders, ropes, scaffolds, or running. She can occasionally bend, stoop, crouch, crawl, balance, twist and squat and requires occasional exposure to heights, dangerous machinery, and uneven surfaces. She has the ability to get along with others; understands simple instructions; concentrates and performs simple tasks; and respond and adapt to workplace changes and supervision but in an occasional public/employee contact setting.

(Tr. 17).

Finally, based upon the VE testimony, ALJ Suttles found Burns capable of light, unskilled employment such as working as an office helper, a mail clerk, or a garment sorter. (Tr. 20). Accordingly, the ALJ held that Burns was not disabled.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.,* 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.,* 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III. LEGAL STANDARDS

### A. *Standard of Review*

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to whether the decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence. *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994); *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007). The Court must affirm the

Commissioner's final decision when substantial evidence supports the Commissioner's decision and the Commissioner followed the relevant legal standards. *See Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000). Reversal is appropriate only if no credible evidentiary choices support the Commissioner's decision. *Johnson v. Bowen,* 864 F.2d 340, 343-44 (5th Cir. 1988); *Stringer v. Astrue*, 465 F. App'x. 361, 363-64 (5th Cir. 2012). Indeed, "[t]he court does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey,* 230 F.3d at 135, *citing Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir. 1999).

**B.  Statutory Basis for Benefits**

Barnes applied for Social Security disability insurance ("SSDI") benefits. Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

**C.  Determination of Disability**

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or

16

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id*. § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id*. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler*, 501 F.3d at 447–48. If, at any step, a conclusive disability determination can be made, the inquiry ends. *See Audler*, 501 F.3d at 447-48; 20 C.F.R. § 404.1520(a).

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *See Perez*, 415 F.3d at 461–62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses the claimant's RFC before proceeding to step four. *Id*. Once the Commissioner

shows that the claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the claimant to rebut this finding. *Id.*

## IV.   ANALYSIS

Burns raises several points of error in her motion for summary judgment. First, Burns contends that the ALJ erred by failing to find that her breast cancer was a severe impairment, and that he further erred by failing to consider all of her impairments, including her lower back and bilateral hip pain. Second, Burns contends that the ALJ failed to obtain an updated medical opinion on the medical equivalency of all of her combined impairments, and the ALJ should have used such an opinion to formulate her RFC. Third, Burns claims that the ALJ failed to consider the side effects of her medications and that the ALJ failed to acknowledge certain evidence that was favorable to her. Burns also asserts that the ALJ erred in evaluating her credibility and her testimony regarding her symptoms. Fourth, Burns claims that the ALJ's RFC assessment did not consider the limiting effects of her pain, and that the VE's response to the ALJ's hypothetical question on the matter was therefore incomplete. Finally, Burns contends that the ALJ erred by failing to determine whether she could maintain employment.

### A. *"Breast Cancer" as a "Severe" Impairment*

Burns first argues that the ALJ should have found that her "breast cancer" was a "severe" impairment. To support her allegation that her history of breast cancer, now in remission, is a severe impairment, Burns points to her alleged symptoms of neuropathy and fatigue. In her motion, Burns argues that neuropathy and fatigue can be "possible" or "common" side effects of chemotherapy, and that the ALJ should have found these

symptoms resulted from her cancer diagnosis and treatment. Accordingly, Burns argues that the ALJ should have ruled her past cancer diagnosis a "severe" impairment. The Court disagrees.

Step two in the sequential analysis requires an ALJ to determine whether a claimant has a medically determinable impairment, or a combination of impairments, that can be described as "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). The Fifth Circuit uses a particular standard to determine whether a claimant's impairment is severe:

> An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

*Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985); *see also Loza v. Apfel*, 219 F.3d 378, 390–91 (5th Cir. 2000) (reaffirming this standard following federal regulatory revisions). In other words, Burns needed to bring forth evidence demonstrating how her past cancer diagnosis and treatment interfered—in any way—with her ability to work.

When the ALJ issued his finding that Burns' history of breast cancer was not a "severe" impairment, he first laid out the facts surrounding Burns' cancer diagnosis and related surgeries, including bone scans, x-rays, CT scans and a MRI. The ALJ noted that there was no evidence in the record suggesting that her cancer had returned or spread and that Burns was not taking any cancer-related medication. The ALJ concluded that, "I find, based on the objective medical evidence, the claimant's cancer is in remission and non-severe. . ." (Tr. 12).

Here, Burns' own evidence and testimony undercut her contention that the ALJ should have considered her breast cancer to be "severe." After her initial June 2009 cancer diagnosis, Burns underwent a successful bilateral mastectomy in October 2009 and received chemotherapy until May 2010. (Tr. 12). In two follow-up visits in 2011, Burns' doctors found no signs that her cancer had returned, and her port-catheter was removed in October 2011. (Tr. 1184-85). Although Burns initially testified at her January 2012 hearing that she "still had the cancer," and that it was "aggressive," she ultimately conceded that her doctors were merely monitoring her to ensure that her cancer remained in remission. (Tr. 51-53).

Burns' testimony about the severity and onset of her physical symptoms, such as pain, neuropathy, and fatigue, was contradictory and often conflated. For example, at her January 2010 hearing, Burns testified that she hurt "all over" due to "arthritis," and that she had been suffering from arthritis pain for "15 years," well before her initial caner diagnosis in 2009. (Tr. 82). While Burns argues that these symptoms are "severe," she also testified that her medications, including "muscle relaxants," helped alleviate her pain. (*Id.*).

Although Burns first testified that her neuropathy and fatigue were side-effects from the chemotherapy she received from 2009 through 2010, she later amended her testimony to state that she had suffered these symptoms since her elevator accident(s) in

2008.[3]  At her January 2012 hearing, Burns specifically discussed her side-effects from chemotherapy as she was being questioned by her attorney:

> Q: Ms. Burns, is there anything that you . . .  Are you experiencing any side-effects still from your chemotherapy treatments?
>
> A: I think I am, yes.
>
> Q: What kind of side-effects do you feel like you experience?
>
> A: Weakness and fatigue.
>
> Q: Are you experiencing any numbness or tingling?
>
> A: Yes.
>
> Q: Where are you experiencing that sensation?
>
> A: In my feet and in my hands.
>
> Q: Okay.  And about how often do you feel that?
>
> A: Well, at least once a week, once or twice a week.
>
> Q: And if you can recall, did you remember feeling that before you started chemotherapy?
>
> A: Yes.
>
> Q: When do you remember starting to feel that numbness and tingling in your feet and hands?
>
> A: *After I got injured in the elevator.*

---

[3] In fact, the ALJ's opinion assigns Burns an RFC limiting her to light work, with only occasional overhead lifting and occasional pushing with the lower extremities, as well as only occasional stair climbing and no ladders, ropes, scaffolds, or running.  The ALJ's RFC analysis acknowledged Burns alleged "weakness and fatigue as the result of chemotherapy" as well as numbness and tingling in her feet and hands, but concluded that Burns' daily activities revealed "a significantly greater physical and mental functional ability than alleged."  (Tr. 19).

Burns then discussed some of her other symptoms, including her sleeping problems, as originating since 2008—the year of her elevator accident:

Q: Can you describe that for us, please?

A: I feel like there's just some evil person out there trying to do something to me. I think that's the reason all this stuff happened to me. That's with everything in my life. It's taken my family. It's taken my health. It's taken my finances. It's just done everything.

I can't sleep. If I go to sleep I feel like somebody getting in the damn bed with me, putting their arms around me, going on. I have to sleep with the TV on all night. I don't sleep. I toss and turn. I don't know what to do.

. . .

Q: Did all this start occurring more often?

A: Yes.

Q: About when did that start happening?

A: It's been happening. It's been happening, I don't know, I guess, my body hasn't been the same. It's been happening since--*this has been happening since '08*. I've been noticing things happening little by little.

. . .

Q: Now, we talked about the medications that you're on. Do they give you any side-effects?

A: Yes.

Q: Oh, I can't concentrate. I get dizzy and sleepy. And I get tired.

During examination by her attorney, Burns also identified the "bulging discs" in her neck, not the chemotherapy, as the cause of the "pain shoot[ing] through [her] arms" and the neuropathy that limited her ability to use her hands. (Tr. 86).

Q: Okay, you talked about some neck pain. Have you been diagnosed with some bulging discs in your neck?

A: Yes.

Q: Okay. Now, does that pain shoot through your arms?

A: Yes.

Q: Does that affect your ability to use your hands?

A: Yes.

Q: Could you do any type of filing or anything like that anymore?

A: No.

Q: Why is that?

A: Because it hurts. My hands hurt. My shoulders hurt.

Q: Your shoulders? Are you able to move your shoulders around like you used to before the [elevator] accident?

A: No.

Q: Does it affect your ability to lift and carry things because your shoulders are in pain?

A: Yes

(Tr. 86-87).

After the ALJ's decision, Burns' counsel submitted additional evidence to the Appeals Council and heavily relies upon this evidence in her current summary judgment motion. This additional evidence is three pages printed from www.cancer.org reciting general information about breast cancer chemotherapy and possible side effects such as hair loss, mouth sores, loss of appetite or increased appetite, nausea and vomiting,

increased chance of infections, easy bruising or bleeding, and fatigue. (Tr. 378). Importantly, the material notes:

> Some women have many side effects, others may have few. The side effects of chemo depend on the type of drug, the amount taken, and the length of treatment. . . . *These side effects are usually short-term and go away after treatment is finished. It's important to tell your health care team if you have any side effects, as there can be ways to lessen them.*

(Tr. 378) (emphasis added). Neuropathy is listed as a possible side effect, along with a note that chemotherapy can "sometimes lead to symptoms (mainly in the hands and feet) like numbness, pain, burning or tingling sensations, sensitivity to cold or heat, or weakness. In most cases this goes away once the treatment is stopped, but it might last a long time in some women." (Tr. 379). Fatigue is also listed as "another common (but often overlooked) problem for women who have received chemotherapy. This may last up to several years. It can often be helped, so it is important to let your doctor or nurse know about it." *Id.*

However, this evidence does not support a conclusion that the chemotherapy effects were severe. This evidence states that chemotherapy side-effects vary from person to person, depend upon the particular treatment a patient receives, and that many of the possible side-effects can be successfully treated. Based upon a review of the record, the Court finds that substantial evidence supports the ALJ's finding that Burns' history of breast cancer was not a "severe" impairment.

### B. ALJ Consideration of Burns' Lower Back and Hip Pain

Next, Burns contends that the ALJ failed to properly consider her lower back and bilateral hip pain when formulating her RFC. The ALJ found that Burns could perform

light work, with the additional limitations of only occasional overhead lifting, pushing with her lower extremities, and stair climbing, but no ladders, ropes, scaffolds, or running. Burns points to SSR 96-8p, which states that, when assessing a claimant's RFC, "the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996).  However, the regulation also cautions that, "[t]he Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s).  Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments."  *Id*. at *2.

To support her argument that the ALJ should have incorporated more restrictions into her RFC, Burns points to a solitary x-ray report from 2011.  (Tr. 1202).  On October 19, 2011, Burns was examined by Dr. Alexander Laceras of the Acres Homes Clinic of Harris County Hospital District.  Burns reported experiencing "lower back and bilateral hip pain" for "almost 3 years now," and that in the two weeks before her visit, she had experienced, "aching, stiff type of pain, non-radiating, 10/10 in severity, no aggravating or relieve factors, no associated dysuria, hematuria, weight loss numbness and tingling." (Tr. 1200).  However, Burns also reported that a heating pad "occasionally relieves the pain."  Dr. Laceras ordered x-rays, ultrasound analysis, and blood work.  The x-rays revealed that "alignment of the spine is normal" and "[t]here is mild L5-S1 disc space narrowing.  Rest of the disc space are normal.  Vertebral body heights are normal. . ."  Dr. Laceras' impression was "mild L5-S1 degenerative disc disease [with] no other

radiographic abnormality."  Burns was instructed to follow up in three months. (Tr. 1202).

This is the only document in the voluminous medical record that Burns points to supporting her allegations of hip and lower back pain.  The record does not show any further treatment by Dr. Laceras for these alleged symptoms, nor does it show that any medication or treatment was prescribed.  In fact, the record shows the opposite—one week before Burns visited Dr. Laceras, another Harris County Hospital District doctor, Dr. Gage Van Horn, reviewed Burns' October 11, 2011 complaints of chronic pain in her "neck, shoulders and entire spine," and noted, "I [have] personally examined [Burns] … [and] I suspect that many of her symptoms are embelished [sic]" (Tr. 1213).  The Court also notes Dr. Terrand's testimony that there were "some inconsistencies and some symptom magnification" in Burns' medical records.  (Tr. 33).  Moreover, Burns' own testimony was that she hurt "all over" for 15 years from "arthritis."

Despite these inconsistencies, the ALJ's decision did consider Burns' 2011 allegations of "lumbar spine pain," "leg pain," and the October 2011 x-ray.  The ALJ noted that Burns' contemporaneous physical examinations did not reveal her to be in any distress, she experienced "symptom reduction with rest," and "she had been performing increased activities."  (Tr. 14-15).  Moreover, the ALJ noted that Burns' physical examination in February 2012 revealed that she had "a full range of motion of the lumber and cervical spine."  (Tr. 15).

Relying upon such evidence, the ALJ's RFC limits Burns to light work, with only occasional overhead lifting, occasional pushing with the lower extremities, as well as

only occasional stair climbing with no ladders, ropes, scaffolds, or running. The ALJ's analysis acknowledged Burns alleged "weakness and fatigue as the result of chemotherapy," as well as her allegations of numbness and tingling in her feet and hands. However, the ALJ concluded that Burns' daily activities revealed "a significantly greater physical and mental functional ability than alleged." (Tr. 19). Accordingly, the Court concludes that the ALJ correctly considered Burns' back and hip pain and did not err when formulating Burns' RFC.

### C. Updated Medical Opinion on Cumulative Effect of Burns' Impairments

Next, Burns contends that the ALJ erred by failing to obtain an updated medical opinion regarding the "potential medical equivalency of [Burns'] cumulative physical and mental impairments." Burns asserts that a large portion of her medical records (over 400 pages) were submitted after the state agency reviewers formulated their opinions in March 2011. Burns argues that the ALJ had a mandatory duty to seek out additional medical opinions regarding the claims based on this new medical evidence. Relying on SSR 96-6p and *Brister v. Apfel*, 993 F. Supp. 574, 578 (S.D. Tex. 1998), Burns argues that the ALJ should have sought a medical expert to opine about "the cumulative physiological/psychological nexus between disparate mental and physical conditions." Otherwise, she argues, the ALJ is essentially left interpreting hundreds of pages of medical records (which she describes as "raw data") and succumbs to "the temptation to play doctor."

In other words, Burns argues that the state agency opinions relied on an incomplete record and the ALJ should have sought additional, updated medical opinions

incorporating all of the new evidence submitted. According to Burns, such additional opinions "might very well have produced a listing equivalence." She does not, however, specify which Listing she might have satisfied or which documents might have carried her burden. She also obliquely argues that her RFC did not properly consider this new evidence. The Court finds these arguments unpersuasive.

SSR 96–6p states that an ALJ must obtain an updated medical opinion from a medical expert "[w]hen additional medical *evidence* is received that in the opinion of the [ALJ] or the Appeals Council *may change the State agency medical . . . consultant's finding that the impairment(s)* is not equivalent in severity to any impairment in the Listing of Impairments." *Akah v. Colvin*, No. No. H–13-CV-2415, 2014 WL 4929284, at *8 (S.D. Tex. Oct. 1, 2014) (emphasis added). "*Thus, the tipping point is whether the additional evidence might change the original finding of the state agency expert*." *Id.* (emphasis added); *see also Doss v. Colvin*, No. 5:13–CV–132–C, 2014 WL 2751026, at *5 (N.D. Tex. June 17, 2014) (affirming ALJ's reliance upon assessments dating from August 2010 through February 2011, even though claimant argued later medical evidence showed substantial deterioration in his condition, finding "the medical evidence dated after April 2011, however, recorded similar medical conditions and treatment as the prior records relied upon by the state agency medical consultants; further, the ALJ discussed Doss's medical records from March and April 2011 in his opinion."); *Gipson v. Colvin*,[4] No. H–12-CV-3258, 2013 WL 5945649, at *10 (S.D. Tex. Nov. 6, 2013) (affirming ALJ opinion despite claimant's contention that, in light of "numerous"

---

[4] Burns' attorney was also the claimant's attorney in *Gipson*.

medical records dating after 2009, ALJ erred by relying on opinions of physicians who reviewed his records in 2009 and by failing to seek updated medical opinion, noting "there is nothing in the subsequent records that undermine the determinations by the disability determination unit physicians [and] [t]he ALJ considered all the records.").

Furthermore, although Burns contends that the ALJ should have sought a medical expert's opinion, the applicable regulations state that "[w]hether the findings for an individual's impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion." SSR 96–5p, 1996 WL 374183, at *3 (July 2, 1996). "In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation." *Id.* Even *Brister v. Apfel*, the case upon which Burns relies, rejects the notion that an ALJ is required to hear from a medical expert in all instances. *See* 993 F.Supp. 574, 578 n. 2 (S.D. Tex. 1998) ("It is clear that when additional medical evidence is received that in the opinion of the ALJ *may change* the State agency medical or psychological consultant's findings, an updated medical opinion regarding disability is required.") (emphasis in original).

In this case, the ALJ properly considered the cumulative effect of all of Burns' impairments, and the ALJ was not required to order any further examinations or medical opinions before finding that Burns' was not disabled. At this step in the ALJ's analysis, the burden is still firmly on the claimant's shoulders. *See, e.g.*, *Reliford v. Colvin*,[5] No.

---

[5] Burns' attorney was also the attorney for the claimant in *Reliford*.

H–12–1850, 2013 WL 1787650, at *14 (S.D. Tex. April 25, 2013) (rejecting argument that ALJ erred by failing to seek an additional medical opinion on whether claimant satisfied a listing, noting "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination.") (citing *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990)). Burns cites no evidence to support her assertion that she "might very well" have been able to show a Listing equivalence, and identifies no specific error regarding the ALJ's assessment of her cumulative impairments. Instead, she only generally asserts that the ALJ impermissibly "substituted his own opinion for that of a medical expert." However, the determination of whether a claimant satisfies a Listing is "one reserved to the Commissioner." *Cain v. Barnhart*, 193 Fed. App'x 357, 361 (5th Cir. 2006).

Although Burns complains that over 400 pages of her medical records were submitted after the state agency review, she fails to note that many of those pages are duplicative of evidence already in the record. Further, Burns fails to specify how the documents that were not duplicative might have impacted the ALJ's decision. In short, "[t]he [C]ourt agrees that an ALJ should not take on the physician's role and draw

---

In *Reliford*, United States Magistrate Judge Nancy K. Johnson addressed the same arguments and reliance upon *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) and *Manso–Pizzaro v. Sec'y of Health & Human Serv.*, 76 F.3d 15, 17–19 (1st Cir. 1996) that Burns raises here. Judge Johnson noted the situations were entirely distinguishable because, "[i]n *Frank*, the Fifth Circuit found it inappropriate for the ALJ to have made his own medical conclusions regarding whether certain impairments would cause signs of atrophy or muscle tone loss." 2013 WL 1787650 at *13 (internal citations omitted). Similarly, "[t]he court in *Manso–Pizzaro* noted that 'given the illegibility of non-trivial parts of the medical reports, coupled with identifiable diagnoses and symptoms that seem to indicate more than mild impairment, we believe the record alerted the ALJ to the need for expert guidance regarding the extent of the claimant's residual functional capacity to perform her particular past employment.'" *Id.* (internal citations omitted).

conclusions from the medical data; however, there is no evidence that the ALJ did so in this case. Plaintiff cites to no specific instance where the ALJ overstepped his bounds in this regard." *Reliford*, 2013 WL 1787650 at *13.

Out of an abundance of caution, this Court has reviewed the 400 pages Burns contends should have resulted in the ALJ requesting an updated medical opinion. In mid-2011, Burns' counsel submitted Exhibits 30F through 42F to the ALJ. These exhibits are records dating from 2003 through 2011, submitted by medical providers such as LBJ Hospital, Ben Taub Hospital, Acres Home Clinic, and other smaller providers. The Court has determined that a large percentage of these documents are duplicates of medical records that are already in the record. For example, Exhibit No. 31F contains Burns' entire medical record from Acres Home Clinic, spanning from August 3, 2009 to May 24, 2011, totaling 193 pages. (Tr. 878-1070). However, only four pages of this exhibit relate to medical care on or after March 21, 2011. (Tr. 879-882). Further, the medical records submitted by Acres Home contain numerous duplicates of Burns' medical reports from other facilities, including a duplicate of much of Exhibit No. 32F, (*compare* Tr. 883-914 and Tr. 1072-94), and a duplicate of nearly all of Exhibit No. 24F (*compare* Tr. 717-747 and Tr. 931-954).

Further, none of the non-duplicative evidence shows any substantive changes in Burns' overall conditions. Exhibit No. 35F contains two brief follow-up reports. (Tr. 1169, Tr. 1177). Exhibit No. 36F consists of notes from Burns' port-catheter removal procedure, which are unrelated to her disability claims. Exhibit No. 37F is the report of Burns' December 8, 2011 check-up with Dr. Britta Ostermeyer, a psychiatrist at

Ben Taub Hospital. In her report, Dr. Ostermeyer recommended a change in Burns' antidepressant medication, from one SSRI drug to another, but otherwise noted little change from her previous visit. (Tr. 1195-96).

The Court notes that some of the new evidence casts Burns and her claims in a negative light. For example, despite the assertions she made at her 2010 ALJ hearing, Burns did not continue to see Dr. Ostermeyer for psychiatric check-ups on a monthly basis. (Tr. 78-81). In fact, Burns did not see Dr. Ostermeyer again until March 8, 2011—a full eight months after the ALJ hearing. (Tr. 868). Additionally, there is no evidence that she followed the advice of a Ben Taub oncologist, Dr. Daniel Epner, during a May 2011 check-up. Dr. Epner suggested that Burns complete back strengthening and stretching exercises, as well as aerobic exercise, to help with her lower back pain. (Tr. 1106). Accordingly, the Court finds that the ALJ was not required to order any further examinations or medical opinions regarding the additional medical records submitted by Burns.

### D.  Side Effects of Burns' Medications

Next, Burns' argues that the ALJ's RFC assessment failed to consider the side effects of her multiple medications, as required by SSR 96–7p, 1996 WL 374186 (July 2, 1996), and SSR 96–8, 1996 WL 374184 (July 2, 1996). An ALJ should consider any side effects of medication when reaching a decision on a claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *see also Loza v. Apfel,* 291 F.3d 378, 396–97 (5th Cir. 2000). Here, the ALJ specifically noted in his opinion that Burns complained of "alleged residual weakness and fatigue as the result of chemotherapy treatment." (Tr. 18).

However, the ALJ concluded that, based on the objective medical evidence, Burns' statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [Burns' RFC]." (Tr. 19). Nonetheless, the ALJ's RFC assessment considered the side effects of Burns' medications, and limited her to light work. Accordingly, the Court finds that the ALJ did not err when considering the side effects of Burns' medications.

### E. ALJ's Consideration of Evidence Favorable to Burns and Subjective Symptoms

Burns also asserts that the ALJ failed to consider her allegations of fatigue and that he failed to properly weigh her allegations of pain. In weighing Burns' impairments and symptoms to assess her RFC, the ALJ noted Burns' complaints at her initial hearing of "residual weakness and fatigue as the result of chemotherapy treatment," as well as the ME's testimony that "the claimant complaints of decreased energy occurred after undergoing chemotherapy." (Tr. 15, 18). The ALJ also commented on Burns' February 2012 physical examination, concluding that she could "at a minimum perform at the light exertional level." (Tr. 15). The ALJ ultimately concluded that Burns' statements "concerning the intensity, persistence and limiting effects of [her fatigue and other claimed ailments] are not credible to the extent they are inconsistent with the [RFC]" (Tr. 19). Accordingly, the Court finds that the ALJ properly considered Burns' fatigue and its effect on her ability to work.

Burns also claims that the ALJ erred in evaluating her testimony about her subjective symptoms of pain and fatigue. The ALJ found that the objective medical evidence did not support her complaints of pain and fatigue, and that Burns' statements

concerning the intensity, persistence, and limiting effects of her alleged symptoms were "not credible to the extent [that] they [were] inconsistent with the . . . [RFC] assessment." (Tr. 19). In making this finding, the ALJ reviewed the objective medical evidence, Burns' own statements about her activities of daily living, and Burns' receipt of unemployment from June 2008 to the end of 2009. *See, e.g., Pineda v. Astrue*, 289 F.2d 710, 713 (5th Cir. 2008) (finding an ALJ must weigh objective medical evidence and assign articulated reasons for discrediting the claimant's subjective complaints); 20 C.F.R. § 404.1529(b), (c). Accordingly, the Court finds that the ALJ did not err in assessing Burns' credibility or in weighing testimony regarding her subjective symptoms such as pain and fatigue.

### F. Burns' Non-Exertional Pain Impairments

Next, Burns contends that the ALJ failed to consider her non-exertional impairment of pain, and that the ALJ posed a deficient hypothetical question to the VE. An ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE if the ALJ did not find those alleged limitations to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988); *see also Gardner v. Massanari*, No. 00-50449, 2001 WL 822457, at *2 (5th Cir. June 18, 2001) ("The hypothetical question that an ALJ poses to a VE need only incorporate the disabilities that the ALJ recognizes."). Here, the ALJ's hypotheticals to the VE included each of the limitations from Burns' RFC. (Tr. 17). Furthermore, Burns was represented by counsel at each of her ALJ hearings and her counsel had the opportunity to pose his own hypothetical to the VE, but did not. *See Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir.

2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts . . . , and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."). Accordingly, the Court finds that the ALJ did not improperly rely upon the VE's answers to any of his hypotheticals.

### G. Ability to Maintain Employment

Finally, citing *Watson v. Barnhart*, 288 F.3d 212, 218 (5th Cir. 2003), Burns argues that the ALJ erred by not considering whether she is capable of maintaining employment on a regular and continuing basis. In *Watson*, the Fifth Circuit held that the ALJ erred by failing to determine whether Watson was capable not only of obtaining, but also maintaining employment. *Watson*, 288 F.3d at 218. However, the Fifth Circuit has more recently clarified that an ALJ is not required to "make a specific finding regarding the claimant's ability to maintain employment in every case." *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). An ALJ must only make the extra finding if the claimant has an impairment that "waxes and wanes" in its manifestation of disabling symptoms. *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003); *see also Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).

In this case, Burns has made no assertions about any symptoms that "wax and wane." To the contrary, her claim is a blanket one: she testified that she has been entirely incapable of performing any kind of work since May 1, 2008, and her symptoms have been unrelenting. The Court notes that it is only now, at summary judgment, that Burns' briefing alleges that her self-reported pain and fatigue are among the class of impairments

that "wax and wane," and thus require a *Watson* finding.  The Court finds that Burns has not demonstrated that her symptoms "wax and wane."

As the Northern District of Texas recently observed, "it is not enough for a claimant to assert, in general, that the impairment waxes and wanes; the claimant must demonstrate that his particular impairment waxes and wanes."  *Tigert v. Astrue*, No. 4:11–CV–00435–Y, 2012 WL 1889694, *7 (N.D. Tex. May 2, 2012) (*recommendation adopted by Tigert*, 2012 WL 1899388 (N.D. Tex. May 24, 2012).  Here, the ALJ found that Burns' testimony about the severity of her symptoms and their level of interference with her ability to work was not wholly credible.  (Tr. 19).  Further, the ALJ's RFC took all of Burns' physical impairments into account, and limited her to only light work. Without evidence in the record to show that her impairments somehow limit her to working only in short intervals, or that her impairments "wax and wane" in such a way as to wholly prevent employment, the ALJ's determination regarding Burns' ability to maintain employment "is subsumed in the RFC definition."  *See Perez*, 415 F.3d at 465; *see also Barratt v. Astrue*, No. 07–51067, 2008 WL 2325636 (5th Cir. Jun. 6, 2006). Accordingly, the Court finds that the ALJ did not err by failing to make a finding as to Burns' ability to maintain employment.

## CONCLUSION

A full review of the record reveals that the ALJ applied the appropriate legal standards in denying Burns disability benefits.  Substantial evidence supports the determination that Burns was not disabled during the relevant time period.  A review of the pleadings, the discovery and disclosure materials on file, and any affidavits shows

that there is no genuine issue as to any material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c). Accordingly, this Court recommends that Burns' Motion for Summary Judgment be **denied** and the Commissioner's Motion for Summary Judgment be **granted.**

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.

**SIGNED** at **Houston, Texas** on December 9, 2014.

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**